**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **CHRISTIAN J. WOOD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 03-CV-298-TCJ-FHM** |
| | ) | |
| **CENDANT CORPORATION and** | ) | |
| **AVIS GROUP HOLDINGS, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**OPINION and ORDER**

Before the Court are Defendants' Motion for Summary Judgment (Docket No. 71), Plaintiff's Motion for Summary Judgment (Docket No. 79), and Defendants' Motion for Reconsideration of Order Granting Discovery Sanctions (Docket No. 193).

**I.      Factual Background**

On July 29, 1996, Plaintiff Christian J. Wood began employment with Avis Group Holdings, Inc.[1]  During his employment with Defendants, Plaintiff was responsible for all forecasting, scheduling, and call-routing activities for Defendants' reservation centers.  In 1998, Plaintiff and Defendants began looking for new forecasting software that would be suitable for use in all of their related divisions.  While searching for the new software, Plaintiff suggested that *StafPlan*, a staffing software program he created prior to his employment with Defendants, might suit the company's needs.  From January to March 1999, Plaintiff began modifications of *StafPlan* and named his derivative model software program *Christal Ball.*

---

[1]Avis Group Holdings, Inc. ("Avis") is a subsidiary company of Cendant Corporation ("Cendant").  Herein, Avis and Cendant are referred to collectively as Defendants.

1

When Plaintiff was initially hired he executed an Assignment of Ideas and Inventions ("Assignment").  Pertinent language of the Assignment reads as follows:

> Any inventions, discoveries, improvements, devices, tools, machines, designs, promotional ideas, practices, processes, services or products ("Inventions") related to Avis' business, produced with the use of Avis time, material or facilities or resulting from or suggested by my work for Avis, whether patentable, copyrightable, or otherwise, which I make, discover, conceive, develop or secure, alone or with others, during my employment with Avis will be disclosed promptly and fully to Avis, are hereby assigned to Avis and shall become the property of Avis as soon as made or conceived.
>
> . . . .
>
> At any time and from time to time upon Avis' request, either during my employment or after the termination thereof, and without charge to Avis, but at its expense, I agree to execute all such instruments and to perform such further acts which Avis might deem desirable in order to (a) effectuate the assignment referred to above; and (b) obtain the Inventions for Avis' benefit including any patent, copyright, trademark or service mark application and all continuations, renewals, or reissuances thereof. My obligation to assign the rights to all Inventions shall survive the termination of my employment for any reason.

(Orig. Compl. at Ex. 1, ¶¶1-2.)

The Assignment also allowed Plaintiff to exclude from his assignment to Defendants any Inventions "made or conceived" prior to the date he executed the Assignment.  *See id.* at ¶2. Pursuant to that provision, Plaintiff identified "Training Run and Staff Planning Budget Spreadsheets" as excluded Inventions.  Plaintiff claims these excluded works included the *StafPlan* computer program that he now alleges Defendants infringed.

Defendants allege that from 1993 until 1996, while Plaintiff was employed with Holiday Inn, he worked with the *Training Run* (or "*T-Run*") software that he identified as an excluded Invention on the Assignment.  Defendants claim, and Plaintiff adamantly denies, that Plaintiff used formulae, inputs, or cells from *Training Run* to develop *StafPlan,* thereby rendering *StafPlan* unoriginal in that it is a derivative of *Traning Run.*

Plaintiff was terminated from Defendants' employ in September of 2002.  Prior to his termination, Defendants offered to conditionally suspend Plaintiff if he would turn over the passwords to *Christal Ball*.  When Plaintiff declined, Defendants offered Plaintiff a severance package wherein he would receive six months salary in exchange for Plaintiff releasing his rights to *Christal Ball*.   Although the six month salary was in excess of the usual severance pay prescribed by Defendants' personnel practices and procedures, Plaintiff again declined and was terminated on September 13, 2002.  In October of 2002, Plaintiff sent Defendants a cease and desist letter alleging copyright infringement of *StafPlan* via Defendants' continued use of *Christal Ball*. Defendants took no action and Plaintiff maintains Defendants were infringing upon his copyright until at least March of 2005.

Plaintiff maintains that Defendants' use of *Christal Ball* increased Defendants' revenues. This contention is disputed by Defendants. However, Defendants do not dispute that Plaintiff received an award that, in the accompanying text, stated that the use of Plaintiff's work had increased revenues in the amount of $37 million in 1999 alone.  Defendants ceased using *Christal Ball* upon entering into a licensing agreement with Bay Bridge, a company with the rights to another long-term forecasting program, *Center Bridge*.

Plaintiff filed the instant lawsuit in May of 2003.  Defendants moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  The Court initially granted the motion and dismissed the case.  After obtaining new counsel, Plaintiff moved the Court to reconsider its Order on Dismissal. The Court granted Plaintiff's Motion to Reconsider and withdrew its initial order to the extent that

it required dismissal of the case. (Docket No. 47.)[2]

In the Reconsideration Order, the Court found Defendants had made lawful use of *Christal Ball* during Plaintiff's employ pursuant to a non-exclusive implied license in *StafPlan*. *See I.A.E. v. Shaver, Inc.*, 74 F.3d 768, 775 (7th Cir. 1996) ("[A] non-exclusive license is . . . an exception to the writing requirement of section 204. In fact, consent given in the form of mere permission or lack of objection is also equivalent to a non-exclusive license and is not required to be in writing.")[3] Plaintiff did not receive any compensation for the license and Defendants do not so assert. Rather, Defendants claim they are not liable for infringement because *Christal Ball* does not infringe *StafPlan*. In the alternative, Defendants argue Plaintiff is estopped from claiming infringement of *StafPlan* or that Plaintiff cannot show any damages caused by the infringement. Plaintiff has likewise moved for summary judgment arguing he is entitled to summary judgment on his infringement claim and the damages caused thereby.

## II.    Defendants' Motion for Reconsideration of Order Granting Discovery Sanctions

On January 6, 2006, the Court entered an Order granting in part Plaintiff's Motion for Sanctions (Docket No. 190) based on certain discovery abuses by Defendants, which Defendants have moved the Court to reconsider. Defendants' Motion for Reconsideration of Order Granting Discovery Sanctions (Docket No. 193) is denied. The Court finds neither fact nor law in the Motion that requires it to reconsider its Order On Sanctions (Docket No. 190). As to Defendants' arguments in their Motion for Reconsideration that also relate to their Motion in Limine (Docket No. 144), the

---

[2]The Order of January 27, 2004 (Docket No. 33) was not withdrawn to the extent that it dismissed Plaintiff's claims for conversion and statutory damages.

[3]It is the law of the case that Plaintiff created *StafPlan* before becoming employed by Defendants and that *Christal Ball* is a derivative of *StafPlan*. (*See* Docket No. 47, p. 8.)

Court will rule on the Motion in Limine at a later time.

### III.    Standard on Cross Motions for Summary Judgment

Summary judgment is generally appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The Court must view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment, but that party must identify sufficient evidence which would require submission of the case to a jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-52 (1986); *Mares v. ConAgra Poultry Co.*, 971 F.2d 492, 494 (10th Cir. 1992). Where the nonmoving party will bear the burden of proof at trial, that party must go beyond the pleadings and identify specific facts that demonstrate the existence of an issue to be tried by the jury. *See Mares*, 971 F.2d at 494.

Because the parties have filed overlapping motions for summary judgment, a modified summary judgment standard is applicable. When parties file cross-motions for summary judgment, the Court may assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nonetheless inappropriate if disputes remain as to material facts. *James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997), *cert. denied*, 523 U.S. 1048 (1998). Where different ultimate inferences may properly be drawn, summary judgment is not appropriate. *Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000).

### IV.    Discussion

Plaintiff asserts that *StafPlan* exists in its entirety within *Christal Ball* and that *Christal Ball* was created when he "wrapped" certain minor enhancements around *StafPlan*. Defendants, however, deny that their use of *Christal Ball* infringed upon Plaintiff's copyright in the software,

offering several alternative arguments freeing them from any liability for copyright infringement. Before addressing Defendants' principal argument, the Court will discuss Defendants' arguments relating to estoppel and Plaintiff's ownership in *StafPlan*.

### A.      Defendants' Estoppel Defense

Defendants argue Plaintiff is estopped from asserting a claim for copyright infringement. Courts applying the doctrine of estoppel in the copyright context utilize a four-prong test: (1) the plaintiff must know the facts of the defendant's infringing conduct; (2) the plaintiff must intend that its conduct shall be acted on or must so act that the defendant has a right to believe that it is so intended; (3) the defendant must be ignorant of the true facts; and (4) the defendant must rely on the plaintiff's conduct to its injury. *See Carson v. Dynegy*, 344 F.3d 446, 453 (5th Cir. 2003).

Though Defendants can meet the first two elements, *i.e.,* Plaintiff knew of Defendants' infringing conduct and Plaintiff intended Defendants to use the *StafPlan* software, Defendant was not ignorant of the fact that Plaintiff was the owner of *StafPlan*.  The evidence to the lack of this element is abundant.  Examples of such evidence include the following:  the Assignment of Ideas and Inventions, where Plaintiff excepted the use of *StafPlan* as a work of his own; the declaration of Randy Buckwalter ("Buckwalter"), Defendants' Corporate Director of Workforce Management and the person Defendants charged with finding appropriate staff forecasting and budget planning software, where Buckwalter states that he knew Defendants' use was subject to Plaintiff's sole access to the program code and that he knew it was to be used during Plaintiff's employment only (Pl.'s Mot. for Summ. J. Ex. C at ¶¶ 8-10); and similar testimony from several other employees, including Michelle Shira who informed Plaintiff that if he planned to sell the software, Defendants would be his "charter customer." (*Id*. at G at 61:18 - 63:16.)  Several of Defendants' executives also

6

testified they were concerned with Plaintiff's restrictions on *Christal Ball* including his control of the software and his consistent refusal to provide the passwords to access the program code. (*See, e.g.*, *id.* at Ex. E. pp. 47-48.) Also telling is the evidence of Defendants' attempts to offer Plaintiff conditional suspension and enhanced severance payments in exchange for his release of his rights in *Christal Ball* and thereby *StafPlan*. (*See, e.g.*, Pl.'s Mot. for Summ. J. Ex. M.) Cumulatively, this evidence creates a strong inference of Plaintiff's intent to maintain *StafPlan* as his own and prevents Defendants from establishing the necessary third element of the estoppel defense. Defendants' Motion for Summary Judgment on grounds of estoppel is denied.

**B.      Plaintiff's Employment with Holiday Inn and the "*Training Run*" Program**

Defendant contends that *StafPlan* is based largely on a program that Plaintiff created while he was an employee at Holiday Inn. Defendant argues, therefore, that certain elements of *StafPlan* do not belong to Plaintiff, but instead belong to Holiday Inn under the "work made for hire" doctrine. *See* 17 U.S.C. § 201(b). Hence, Defendants conclude, to the extent that components of *Training Run* were incorporated into *StafPlan*, those elements are not Plaintiff's protectable expression. Plaintiff responds by first admitting that he authored software that was subsequently adopted for use by Holiday Inn. (Pl.'s Mot. for Summ. J. Ex. A at ¶ 3.) Plaintiff states he did not name this software, but did refer to it as *Training Run* for the reason that label was descriptive of the software's main output. As a factual matter, Plaintiff disputes that *Training Run* was "work made for hire" for Holiday Inn. Plaintiff declares that he created *Training Run* on his own personal time and outside the course and scope of his duties as the "Payroll and Scheduling Supervisor" at Holiday Inn. (*Id.*) He also avers that he did not copy the software, formulae, or code in the creation of *StafPlan*, including that code found in the Holiday Inn or *Training Run* software. (*Id.*) Therefore,

7

Plaintiff states, *StafPlan* is not a derivative work of Holiday Inn's software.  *See* 17 U.S.C. § 101

(defining derivative work as work based on one or more  preexisting works).

   To prove their claim to the contrary, Defendants offer the Declaration of Brian Jeppeson, a

current employee of Defendants who was formerly an employee of Holiday Inn at the same time as

Plaintiff.  Jeppeson declares:

> I worked with Chris Wood and used an Excel spreadsheet for long-term budget and
> staff planning called *Training Run* or *T-Run*.  I maintained a copy of it in my
> personal files.  A true and correct copy of this spreadsheet file is attached as Exhibit
> A to my Declaration.  This is the version of the spreadsheet that was in use at the
> time Mr. Wood left Holiday Inn to go to work for Avis.

(Ex. G to Def. Mot. for Summ. J.)   This is Defendants' only evidence that *Training Run* is a "work

made for hire."

   In addition to his denial that *Training Run* is a "work made for hire," Plaintiff further

disputes that the spreadsheet provided by Jeppeson, and used by Defendants' expert, Dr. Hayes

("Hayes"), in his  analysis, is a version of *Training Run* that was in use while Plaintiff was employed

with Holiday Inn.  The *Training Run* spreadsheet has a "create date" of September 1997 and a last-

modified date of November 2004.  The 1997 create date makes it an impossibility that Plaintiff

created or appropriated that version of *Training Run* because he no longer worked at Holiday Inn

in 1997. Obviously, it would not be possible for *StafPlan* to have borrowed from *Training Run* if

that software was not only modified but was actually created after the *StafPlan* software was created.

Further, Plaintiffs' expert, Lisa Anderson, disputes that *Training Run* and *StafPlan* are similar, and

declares that "*Training Run* is radically different in its architecture, core elements and

functionalities, and logic from *StafPlan*."  In sum, Plaintiff argues that Defendant's "Holiday Inn"

theory has no evidentiary support, is physically impossible due to the "create date" on the *Training*

*Run* spreadsheet, and that *Training Run* and *StafPlan* are not in fact similar at all.  The Court agrees.

No evidence has been offered by Defendants to refute Plaintiff's claims either that the create date

of the software makes it impossible for Plaintiff to have copied *StafPlan* from *Training Run*, (*see*

Depo. or Robert Hayes, 8:24-25, 9-10, 28:9-13), or that *Training Run* and *StafPlan* are not similar.

(*See infra.* at 16-17 (discussing Defendants' expert's incomplete analysis of *StafPlan*).)[4] Jeppesen's

declaration is insufficient evidence to create a question of fact in the face of the inconsistent create

date of the version of *Training Run* offered by Jeppesen and the lack of expert testimony supporting

the similarities between *StafPlan* and *Training Run*.  Defendants' Motion for Summary Judgment

is denied regarding its arguments that *Training Run* is a "work made for hire" and that *StafPlan* was

derived from *Training Run.*  In turn, the Court *sua sponte* grants summary judgement to Plaintiff on

this issue, finding as a matter of law that *StafPlan* is not a work for hire.  *See Ward v. Utah*, 398 F.3d

1239, 1246 (10th Cir. 2005) (noting *sua sponte* summary judgment permissible where the party is

on notice to come forward with all evidence).

## C.    Copyright Infringement

To establish infringement, two elements must be proven: (1) ownership of a valid copyright,

and (2) copying of constituent elements of the work that are original.  *See Feist Publications, Inc.*

*v. Rural Telephone*, 499 U.S. 340, 361 (1991).  As to the first element, a plaintiff must prove a valid

copyright.  *Gates Rubber Co. v. Bando Chemical Indus.*, 9 F.3d 823, 831 (10th Cir. 1993).  A

Certificate of Registration is prima facie evidence of a valid copyright.  *Id.*  Plaintiff has presented

---

[4]Hayes states that *StafPlan* and *Training Run* would seem to flow from one another only *if Training Run* was created before *StafPlan.*  Defs.' (Mot. for Summ. J. Ex. B at ¶5.) According to Plaintiff, Hayes misstates the elements of *Training Run* claiming for example, that *Training Run* contains elements that it does not actually contain.  (Pl.'s Mot. for Summ. J. Ex. A ¶20.)

a valid Certificate of Registration for Copyright in *StafPlan*, Copyright Certificate Number Txu 1-096-957.  (Docket Nos. 139, 151). With the Certificate of Registration comes the "presumption of validity" in the Copyright.  *See* 17 U.S.C. § 410; *La Resolana Architects, PA v. Clay Realtors Angel Fire*, 416 F.3d 1195, 1207-8 (10th Cir. 2005).  The evidence in the record regarding registration is therefore sufficient to shift the burden to Defendants to demonstrate why the copyright is invalid. Thus, Defendants must now show "that the work in which a copyright is claimed is unprotectable (for lack of originality) or, more specifically, to prove that the portion of the copyrighted work actually taken is unworthy of copyright protection."  *Bateman v. Mnemonics, Inc*., 79 F.3d 1532, 1541 (11th Cir. 1996).

"The second element requires proof that defendants copied plaintiff's work and that the elements copied were protected." *Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1284 (10th Cir.1996).  Evidence of copying can be direct or indirect.  Although direct evidence is rare, *Gates Rubber Co.*, 9 F.3d at 833, it is present here.  Defendants do not dispute that Plaintiff permitted them to use *StafPlan* and that it was the basis for *Christal Ball*.  Instead, Defendants argue that any copied elements are not protected.

After determining a computer program has been copied, the Court must then address "whether, as a mixed issue of fact and law, those elements of the program that have been copied are protected expression and of such importance to the copied work that the appropriation is actionable." *Gates Rubber*, 9 F.3d at 832.  "Accordingly, in order to impose liability for copyright infringement, the court must find that the defendant copied protectable elements of the plaintiff's program and that those protectable elements comprise a substantial part of the plaintiff's program when it is considered as a whole."  *Id.* at 833.

10

"A 'computer program' is a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." 17 U.S.C. § 101. "[T]he expression adopted by the programmer is the copyrightable element in a computer program, and . . . the actual processes or methods embodied in the program are not within the scope of copyright law." *Id.* (quoting 1976 House Report on § 102(b) of the Copyright Act). As such, the Copyright Act provides that "idea[s], procedure[s], process[es], system[s], method[s] of operation, concept[s], principles, or discover[ies]" are not protectable. 17 U.S.C. § 102(b). Of course, the difficulty is in understanding what is an expression versus what is an idea or process. Very generally, the gist of the distinction is that what is protected is the writing of the computer program as a whole—the instructions that produce the result—rather than the individual elements that make up the instructions. In discussing expression versus idea, the *Gates Rubber* court noted, "the structure, sequence, and organization of the software may be [what is] protectable." *Id.* at 840. In short, to be protectable expression, the structure, sequence and organization must be original expression rather than idea. *Id.* at 837 (citing *Feist,* 499 U.S. at 361) ("Originality in the field of copyright requires that the work be independently created and that it possess a minimal degree of creativity.").[5]

To determine protectable elements of expression for infringement claims, the Tenth Circuit typically requires a complicated analysis known as the abstraction-filtration-comparison test.[6]

_____

[5]*See Gates Rubber,* 9 F.3d at 837(noting originality as one of two elements required for copyright protection, the other being the ability of the expression to be fixed in a tangible forum).

[6]According to the Tenth Circuit, this test is particularly apt for determining the scope of copyright protection for computer programs. *See Gates Rubber,* 9 F.3d at 831.

Essentially, the test requires the Court to determine the protected elements of the alleged infringed work and then compare them to the infringing work to determine whether the protectable elements are substantially similar to the original work. "*However, . . . the appropriate test to be applied and the order in which its various components are to be applied in any particular case may vary depending on the claims involved, the procedural posture of the suit, and the nature of the computer programs at issue.*" *Gates Rubber*, 9 F.3d at 834 n.12 (emphasis added); *see also Mitel v. Iqtel, Inc.*, 124 F.3d 1366, 1373 (10th Cir. 1993).

Here, Plaintiff claims that at a minimum, *StafPlan* is an original work that qualifies for copyright protection as a compilation or "arrangement, selection, and coordination." Plaintiff admits that if the original work is merely a compilation, it is entitled to only a "thin" copyright. *See* 17 U.S.C. § 101 ("A 'compilation' is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term 'compilation' includes collective works."); *Transwestern Pub. v Multimedia Mktg. Assoc.*, 133 F.3d 773, 776 (10th Cir. 1998) (holding a compilation protectable insofar as it features original selection, arrangement or coordination of facts as they appear in a 'work as a whole'")(citation omitted). Only a modicum of originality is required for a compilation to be protectable, and copying the work as a whole constitute infringement. *Feist Publications*, 499 U. S. at 348; *Atari Games Corp. v. Oman*, 979 F.2d 242, 244 (D.C. Cir. 1992). In suggesting that the Court find Plaintiff has at least a thin copyright, Plaintiff admits that he does not claim copyright in the individual parts of *StafPlan*, but rather in the complete set of instructions that make *StafPlan* produce the results that it does. Thus, the only question is whether the instructions are protectable. In this regard, the United States Supreme Court

has stated:

> The only conceivable expression [then] is the manner in which the compiler has selected and arranged the facts. Thus, *if the selection and arrangement are original, these elements of the work are eligible for copyright protection.* . . . No matter how original the format, however, the facts themselves do not become original through association. . . . . This inevitably means that the copyright in a factual compilation is *thin.* Notwithstanding a valid copyright, a subsequent compiler remains free to use the facts contained in another's publication to aid in preparing a competing work, *so long as the competing work does not feature the same selection and arrangement.*

*Feist*, 499 U.S. at 349 (emphasis added).  Further, the Tenth Circuit has held that "[w]here . . . the alleged infringement constitutes the admitted literal copying of a discrete easily-conceptualized portion of a work, [the Court] need not perform complete abstraction-filtration-comparison analysis. . . .[The Court] may proceed to the protectability analysis that is normally subsumed in the filtration portion of the abstraction-filtration-comparison approach."  *Mitel,* 124 F.3d at 1373.  Assuming arguendo Plaintiff is entitled to only a thin copyright, the Court need not engage in the full abstraction-filtration-comparison analysis. *Mitel*, 124 F3d at 1373 (suggesting truncated abstraction-filtration-comparison test where literal copying has occurred).  Thus, the Court proceeds with the modified abstraction-filtration-comparison analysis permitted by both *Gates Rubber* and *Mitel* in circumstances such as those presented here.  *See, e.g., Gates Rubber*, 9 F.3d at 834 n.12 ("[T]he appropriate test to be applied and the order in which its various components are to be applied in any particular case may vary depending on the claims involved, the procedural posture of the suit, and the nature of the computer programs at issue.").

### 1.    *Step 1:  Abstraction*

"[A] computer program can often be parsed into at least six levels of generally declining abstraction: (i) the main purpose, (ii) the program structure or architecture, (iii) modules, (iv) algorithms and data structures, (v) source code, and (vi) object code."  *Gates Rubber*, 9 F.3d at 835.

The Tenth Circuit declined to set forth any strict methodology for the abstraction of computer programs, but indicated that the organization of a program into abstraction levels is not an end in itself but is only a tool that facilitates the critical next step of filtering out unprotectable elements of the program. *Id.* at 835-36. All experts involved in this matter purport to have performed the abstraction step of the *Gates Rubber* analysis and the Court has reviewed same.[7]

### 2.    Step 2:  Filtration/Protectability

Typically, abstraction elements (i),(ii), and (iii) are not protectable because they are ideas rather than expressions. The latter three abstraction elements can be loosely grouped together as processes, *id.* at 834, although the lower the level of abstraction, the more potential there is for finding protectable elements. *Computer Associates Int'l. v. Altai, Inc.,* 982 F.2d, 693, 707 (2nd Cir. 1992). Generally, processes are not protectable in that they contain facts (i.e. the names in a telephone book), things in the public domain, expression that is inseparable from ideas, discoveries underlying the expression (known as the merger doctrine),[8] or expressions that are standard, stock, or common to a particular topic or that necessarily follow from a common theme or setting (known as the *scenes a faire* doctrine).[9] On the other hand, it is important to keep in mind that "facts

---

[7]"Experts will provide substantial guidance to the Court in applying abstractions test." *Gates Rubber*, 9 F.3d at 835.

[8] The merger doctrine denies protection to those elements of a program dictated by purely efficiency concerns, meaning, where the idea can be expressed in only one fashion. "[T]he practicalities of the task effectively limit the number of choices of expression available to the programmer." 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT, § 13.03[F][2] at 13-136 (1997).

[9]The doctrine of *scenes a faire* applies "particularly to computer programs, because in many instances, it is virtually impossible to write a program to perform particular functions in a specific computing environment without employing standard techniques." 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT, § 13.03[F][3] at 13-137 (1997).

themselves are not protectable; however, an author's original compilation arrangement or selection of facts can be protected by copyright." *Id*. at 838. And likewise, "[a]lthough processes themselves are not copyrightable, an author's description of that process, so long as it incorporates some originality, may be protectable." *Id.* at 837. This filtration/protectability analysis process is done by the Court with the assistance of experts. *Id.* at 833 n.7. Again, when evaluating a work as a compilation, only a modicum of originality is required. *Feist*, 499 U.S. at 348.

Plaintiff and Plaintiff's expert Lisa Anderson ("Anderson") opine that there are numerous protectable elements of *StafPlan* and that *StafPlan*, at a minimum, is protectable as a compilation. (*See generally* Pl.'s Mot. for Summ J. Exs. A, P ; Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. A; Pl.'s Reply to Def.'s Resp. to Pl.'s Mot. for Summ. J. Exs. U, W.) Thus, the Court's analysis, for purposes of summary judgment, hinges on the determinations of Defendants' expert, Hayes. Hayes contends that after filtration, *StafPlan* contains only very few original expressions and that Plaintiff is not entitled to even thin copyright protection because *StafPlan* is not an original "compilation."

Plaintiff spends considerable time convincingly explaining why Hayes' opinions are incorrect. First, Plaintiff contends Hayes misinterpreted the *Gates Rubber* test in that he did not have a complete understanding of what was protectable under copyright law. (Dep. of Robert Hayes at 61: 4-25, 62:1-23, 63:7-19.) For example, Hayes testified that he believed expressions related to labeling, terminology, formatting, and location, (*id*. at 53:20-23); that he did not look at formulae or source code, (*id.* at 47; 93:23-25; 94-95),[10] and that he did not complete the abstraction-filtration-

_____

[10]While formulae may not be protectable, the instruction that make up those formulas can be protectable. *See Mitel*, 124 F.3d at 1372 (noting that while element of work may be characterized as method of operation, that element may nonetheless contain expression eligible for copyright protection).

comparison analysis, (*id*. at 62:16-25, 63:1-12).  Further, Hayes admits that he did not look behind the formulae in *StafPlan* to the structure, sequence, and organization of the software.  (*See, e.g, id.* at 62, 63:1-19.)  In spite of his misunderstanding of the abstraction–filtration-comparison test and his resulting incomplete application of same, Hayes' repeatedly stated that numerous features of *StafPlan* are distinctive, unique, or original as are the selection, arrangement and organization of *StafPlan*.  (*See, e.g., id.* at 30:10-23; 33:20-25, 34:1-7, 39-40 (Hayes says AHT calculator is a distinctive feature that *StafPlan* has its own set of instructions as to and within the AHT calculator)); (*id*. at p. 86 l. 8-5-; p. 87 ll. 1-18 (AHT calculator unique)); (*id*. at 66- 67, 68:1-4, 70:17-23 (unique use of Erlang C approximation)).

Second, Plaintiff maintains that Hayes used an inappropriate version of the software for comparison.[11]  Finally, and most importantly Plaintiff argues, Hayes unequivocally stated in both his reports and deposition testimony that *StafPlan* comprised the core of *Christal Ball*.  An excerpt from Hayes' deposition to that effect follows:[12]

> Q: (By Mr. Mastrogiovanni) And do you see the very first paragraph that begins with Staff Plan seems to be the basis for Christal Ball?
> A: Yes.
> Q: That is your opinion, isn't it?
> A: Yes.

---

[11]The appropriate version of the software for comparison is in contention.  Defendants argue that Plaintiff incorrectly compared a November 2001 copy of *Christal Ball* to the copyrighted version of *StafPlan* while Plaintiff maintains Defendants incorrectly compared a version of *Christal Ball* that was altered after Plaintiff left Defendants' employ.  This matter need not be resolved for purposes of summary judgment.  Because Hayes made a comparison of what Defendants contend is the appropriate version of *Christal Ball* with *StafPlan* and because the Court relies on Hayes' conclusions regarding the version of *Christal Ball* he used, Defendants' arguments as to Plaintiff's use of an incorrect version are irrelevant.

[12]Hayes' deposition was taken on September 15, 2006.  His deposition testimony was after both his initial and supplemental report.

> Q:    All right. And then if you look into that paragraph, you will see the reference to Staff Plan formed the core of Christal Ball.  Did I read that correctly?
> A:    Yes.
> Q:    And that is your opinion is it not?
> A:    Yes.
> Q:    And in fact, you used the word "virtually" in your very first paragraph stating that Christal Ball incorporated virtually all of the distinctive features of Staff Plan, is that correct?
> A:    Yes.
> Q:    And that is your opinion, is it not?
> A:    Yes.

(*Id.* at 5:8-25.; *see also id.* at 14:10-15 (wherein Hayes states *Christal Ball* is largely an extension of *StafPlan*.))  Hayes also testified that *Christal Ball* could not function without what he considered to be original elements of *StafPlan,* (*see id. at* 43:4- 25; 44:1-2), also suggesting originality in Plaintiff's expression.  *See Dun & Bradstreet Software Services, Inc. v. Grace Consulting, Inc.,* 307 F.3d 197, 208 (3d Cir. 2002) (infringement found when software would not work without the core elements of the infringed software).  Taken cumulatively, Hayes' testimony, like Plaintiff's and Anderson's, supports the conclusion that Plaintiff's work qualifies for a thin copyright in that it  is original in its selection and arrangement and contains the requisite modicum of creativity to support protection as a compilation.   *StafPlan* is a unique sequence, in which Plaintiff exercised creativity in the selection and arrangement of, at the least, the instruction lines. *See Atari v. Nintendo of America, Inc.,* 975 F.2d 832, 839-40 (Fed. Cir. 1992). Defendants simply have not show any competent evidence to the contrary.  Defendants are denied summary judgment as to their argument that *StafPlan* contains no protectable elements or arrangements.  Plaintiff is granted summary judgment to the extent that he asks that the Court find that his work is, at a minimum, a compilation entitled to a thin copyright.

## 3.    Step 3: Comparison

Throughout this matter Plaintiff has argued that the Court should apply the "virtual identity" test at the comparison level to determine whether infringement took place, citing a Ninth Circuit case, *Apple Computer, Inc., v. Microsoft, Corp.*, 35 F.3d 1435 (9th Cir. 1994). The test is a higher burden on Plaintiff than the substantially similar test, and is used where, as here, a copyright is entitled to only "thin" protection because it has few protectable elements.[13]  Although *Apple* came after *Gates Rubber*, the *Gates Rubber* court had previously rejected a number of tests advocated for guiding courts at the comparison step. However, in *TransWestern Pub. Co. LP v. Multimedia Marketing*, 133 F.3d 773, 776-77 (10th Cir. 1998), the Tenth Circuit said this,

> '[I]f substantial similarity is the normal measure required to demonstrate infringement, 'supersubstantial' similarity must pertain when dealing with 'thin' works.' 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT, § 13.03[A] at 13-28 (1997); *see also Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1439 (9th Cir.1994) ("When the range of protectable and unauthorized expression is narrow, the appropriate standard for illicit copying is virtual identity.?), *cert. denied*, 513 U.S. 1184 (1995); JANE C. GINSBURG, No "*Sweat*"? *Copyright and Other Protection of Works of Information After Feist v. Rural Telephone*, 92 COLUM. L.REV. 338, 349 (1992) ( "'Even if the compilation is deemed original, what kind of copying will be held to infringe it?' The answer [after *Feist* ] appears to be: 'Virtually none, short of extensive verbatim copying.'"). Further, because the copyrightability of a factual compilation depends upon the originality in selection, coordination or arrangement of the facts 'as a whole' work, 17 U.S.C. § 101, in an infringement action the court must compare the allegedly infringing work as a whole also.[14]

From this language, the Court concludes the Tenth Circuit recognizes the equivalent of the virtual

---

[13]In requesting that the Court apply a virtual identity test, Plaintiff, to a certain extent admitted that he was entitled to a thin copyright.

[14]*See also Landsberg v. Scrabble Crossword Game Players, Inc.*, 736 F.2d 485, 488 (9th Cir.) ("[S]imilarity of expression may have to amount to verbatim reproduction or very close paraphrasing before a factual work will be deemed infringed."), *cert. denied*, 469 U.S. 1037 (1984); *Harper House, Inc. v. Thomas Nelson, Inc*., 889 F.2d 197, 204 (9th Cir. 1989) (holding that plaintiff's work was copyrightable only as 'selection coordination, or arrangement,' and that 'only bodily appropriation would justify a finding of infringement.')

18

identity test—the "supersubstantial similarity" test—for the purposes of the comparison element of the abstraction-filtration-comparison test.

Determining whether there is substantial similarity, or supersubstantial similarity, of the original work and the allegedly infringing work is a matter reserved for the jury.

> Because "[n]o easy rule of thumb can be stated as to the quantum of fragmented literal similarity permitted without crossing the line of substantial similarity," whether works are substantially similar is "a classic jury question.". . . . *Cf. King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089 (10th Cir.1999) (holding the trier of fact should normally make the determination of similarity in a trademark infringement case, but the court can monitor the 'outer limits' of similarity if 'reasonable minds' could not differ on the question).

*Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 943 (10th Cir. 2002); *see also Peel & Co., Inc. v. The Rug Market,* 238 F.3d 391, 395 (5th Cir. 2001) ("Typically, the question of whether two works are substantially similar should be left to the ultimate factfinder . . . ."). Thus, Plaintiff is denied summary judgment as to the issue of virtual identity or supersubstantial similarity. Defendants are likewise denied their request that the Court find as a matter of law that "no reasonable jury, properly instructed, could find that the two works are" virtually identical. *General Universal Systems, Inc. v. Lee,* 379 F.3d 131, 142 (5th Cir. 2004) (citations omitted).

Because the question at the comparison stage is "primarily a qualitative rather than a purely quantitative analysis," *Gates Rubber Co.,* 9 F.3d at 839,[15] the Court intends that the parties will use expert testimony extensively in proving or disproving the similarity of the works as a whole, to the judge or the jury. *See Computer Associates Intern., Inc. v. Altai, Inc.* 982 F.2d 693, 713 (2nd Cir. 1992) ("Rather, we leave it to the discretion of the district court to decide to what extent, if any,

---

[15]*See also Dun & Bradstreet,* 307 F.3d at 197 (where the allegation was literal copying, the court rejected the defendants' attempts to argue that because there was *de minimis* quantitative infringement finding the appropriate analysis is one of qualitative infringement).

expert opinion, regarding the highly technical nature of computer programs, is warranted in a given case.").

### C.    Damages

#### 1.    *Statutory Damages*

The Court has previously determined that statutory damages are not available to Plaintiff in this case.  (Docket Nos. 33 and 47.)

#### 2.    *Actual Damages (Plaintiff's Lost Profits)*

Under 17 U.S.C. §504(b), the "copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." Plaintiff's expert, Z. Eric Stephens ("Stephens"), simplifies this by stating that economic damages are "the greater of the plaintiff's profits or the defendant's profits."  Plaintiff's expert concludes that plaintiff's "lost profits" would have been $1,535,000, which is based on the price of replacement software for *Christal Ball* for a three-year period.  Thus, Plaintiff's theory of  "actual damages" is that Defendants would have purchased *StafPlan* from Plaintiff for this price, but for the infringement.  Defendants dispute Stephens' calculations of Plaintiff's lost profits, arguing they improperly include the costs of customization/implementation and maintenance/support, in addition to the estimated cost of licensing business units that did not use *Center Bridge*.  Defendants also claim that *Center Bridge* is a superior product to *Christal Ball* in terms of functionality, ease of use, and stability.

In addition to contesting Stephens' conclusions, Defendants argue that Plaintiff has never attempted to market or sell any rights or licenses to *StafPlan*, and it is therefore "wholly speculative"

to assume that the alleged infringement caused him to lose any profits.  In Defendants' cited case, *Par Microsystems, Inc. v. Pinnacle Dev't Corp.,* 995 F. Supp. 658 (N.D. Tex. 1998), the court found a jury could not have reasonably awarded profits because the plaintiff no longer had a "a product of its own to sell or to license" at the time for which the jury awarded damages.  Here, Plaintiff had such a product.  Even though there is no evidence Plaintiff licensed or sold *StafPlan* to others, it cannot be said it is "wholly speculative" that Plaintiff would have sold *StafPlan* to Defendant but for the infringement.

### i.      *Profits of the Infringer (Disgorgement of Defendant's profits)*

With respect to the second issue—Defendant's profits attributable to the infringement—Plaintiff has likewise created an issue of material fact as to causation.  Plaintiff's expert offers three alternative methods of calculating Defendants' profits realized by the infringement.  Each of these theories supplies a plausible causation link that entitles Plaintiff to jury determination on the issue. None of the theories are too speculative as a matter of law but rather require jury contemplation. Defendants have also created substantial issues of fact with respect to the alleged profits they earned from the infringement:  As the reports of both parties' damages experts reveal, the issue of profits is highly subjective and cannot be determined as a matter of law.  Based on the material disputes raised by Defendants as to Plaintiff's claimed actual damages and the issue of fact likewise created by Plaintiff as to the issue of what he would have done but for the infringement, the Court denies both parties' Motions for Summary Judgment regarding damages.

**V.      Conclusion**

It is the ORDER of the Court  Defendants' Motion for Partial Summary Judgment (Docket. No. 71) is DENIED in its entirety; Plaintiff's Motion for Summary Judgment (Docket. No. 79) is GRANTED as to Defendants' estoppel defense, ownership in *StafPlan*, and a thin copyright in *StafPlan* and DENIED as to virtual identity and damages; and Defendants' Motion for Reconsideration of Order Granting Discovery Sanctions (Docket No. 193) is DENIED in its entirety.

ORDERED THIS 11th DAY OF APRIL, 2006.


_____
TERENCE KERN
UNITED STATES DISTRICT JUDGE